UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PEGGY CONNIN,

                Plaintiff,                              Hon. Ellen S. Carmody

v.

                                                Case No. 1:18-cv-101

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/


## OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment. Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social

security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 43 years of age on her alleged disability onset date. (PageID.199). She successfully completed high school and worked previously as a home health aide. (PageID.62). Plaintiff applied for benefits on September 4, 2014, alleging that she had been disabled since August 1, 2012, due to depression, fibromyalgia, chronic hernias in stomach, and sleep apnea. (PageID.199-209, 234). Plaintiff's applications were denied after which time she requested a hearing before an Administrative Law Judge (ALJ). (PageID.100-96).

On October 6, 2016, Plaintiff appeared before ALJ Lawrence Blatnik with testimony being offered by Plaintiff and a vocational expert. (PageID.69-98). In a written decision dated January 10, 2017, the ALJ determined that Plaintiff was not disabled. (PageID.46-64). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.27-31). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2015. (Tr. 48); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can

---

[1]    1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2.    An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) history of hernias and corrective surgery; (2) degenerative joint disease/osteoarthritis of both knees, status post left knee arthroscopy; (3) sleep apnea; (4) degenerative disc disease of the lumbar spine; and (5) obesity,

---

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4.  If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.   (PageID.48-52).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she can lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; (2) during an 8-hour workday, she can stand or walk for 2 hours with the ability to change positions for 3-5 minutes after standing or walking for 20-30 minutes; (3) during an 8-hour workday, she can sit for 6 hours with the ability to change positions for 3-5 minutes after standing or walking for 20-30 minutes; (4) she can occasionally use her left lower extremity to operate foot controls; (5) she can occasionally balance, crouch, and climb ramps and stairs; (6) she can frequently stoop, kneel, and crawl; (7) she can never climb ladders, ropes, or scaffolds, work at unprotected heights, or work with moving mechanical parts; and (8) she requires ready access to a restroom. (PageID.52).

The ALJ found that Plaintiff was unable to perform her past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.   While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).   This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964.

Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 125,000 jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (PageID.94-97). This represents a significant number of jobs. *See, e.g., Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016) ("[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant'"). Accordingly, the ALJ concluded that Plaintiff was not entitled to disability benefits.

## I.      Medical Evidence

The administrative record contained several hundred pages of medical treatment records and Plaintiff's statements. The ALJ discussed this evidence in great detail:

> According to the claimant's testimony and the medical evidence of record, the claimant has had a complicated history of multiple hernia repairs and subsequent symptoms of frequent vomiting, nausea, and bowel incontinence during the relevant period. The record indicates that the claimant had a ventral hernia repair with mesh in February 2013. The claimant reported to subsequent treating physicians that she had not had any abdominal pain prior to February 2013. The claimant sought treatment at a hospital emergency room in March 2013 with reports of abdominal pain and swelling at the incision site. At that time, the claimant had an incision, drainage, and debridement procedure to remove abdominal wall fluid. The claimant returned to the hospital emergency room in April 2013 and reported that she had been doing well until the previous week when she experienced abdominal pain, distention, and vomiting. The claimant reported that the prior fluid collection site had been increasing in size over the past few days. A computed tomography (CT) scan of the claimant's abdomen showed only superficial fluid collection at the site. There was no evidence of an infection. The examining clinician discharged her and advised her to continue

wearing her previously prescribed abdominal binder and to take pain medication as needed (Exhibit 1F).

The evidence of record indicates the claimant did not seek treatment for her abdominal pain again until January 2014. After reporting symptoms of vomiting, nausea, and liquidy stools, she had a surgical procedure to repair the incision site of the previous hernia. However, the claimant returned to the hospital emergency room in February 2014. She reported a good recovery from the previous procedure until she developed abdominal pain over the previous day. A CT scan showed a chronic ventral hernia, but no incarceration or strangulation. She was treated with intravenous fluids, pain medication, and advanced to a regular diet without complication. Prior to her discharge from the hospital, the attending clinician observed a soft, non-distended abdomen that was mildly tender to palpation (Exhibits 1F, 2F, 7F, 9F, 10F).

The claimant sought an evaluation of her recurrent hernia with a specialist in April 2014. She described her past medical history with bariatric surgery in 1992 and seven subsequent incisional hernia repairs. The claimant told the specialist that she experienced chronic abdominal pain and occasional nausea. She was taking Zofran as needed, and Norco and Ibuprofen for pain control. The clinician observed a soft and distended abdomen with mild generalized tenderness to palpation. The physician also noted a reducible bulge with a fascial defect in the periumbilical region and an area of bulging in the upper aspect of the incision. The physician recommended a ventral hernia repair given the size and recurrent nature of the hernia. The clinician advised the claimant that she would need to lose 40 pounds and stop smoking two months before the surgery. The physician noted that the claimant would contact the office once she had stopped smoking and lost 40 pounds (Exhibit 1F).

The claimant was evaluated by a surgeon in July 2014 to discuss a surgical weight loss procedure. The surgeon reviewed her history and noted that the claimant was a Class III obese woman with a body mass index (BMI) of 51.42 and height of 5'1." He indicated that she was a potential candidate for a revision of her previous bariatric procedure. The physician stated that the claimant would require significant weight loss before any surgical procedure and referred her to the bariatric program at the same facility. The record shows that the claimant was accepted into the Bariatric Surgery program at the facility and she had the gastric sleeve procedure performed in November 2015. Two weeks after the procedure, her staples were removed and the incision was healing. The claimant's primary care physician examined the claimant after her surgery, in early

December 2015, and noted that the claimant had lost 30 pounds (Exhibits 7F, 9F, 10F, 13F, 14F).

After surgery, the claimant had difficulty transitioning to a solid food diet. The claimant sought treatment at a hospital emergency room in early January 2016 for abdominal pain. She reported that she vomited even small amounts of liquid. An esophagram did not reveal an obstruction as it showed a free flow of the contrast into the proximal small bowel through the gastric sleeve. The claimant was discharged three days later with a post-pyloric feeding tube due to her failure to thrive. She returned to the hospital a week later with complaints of abdominal pain and constipation. A CT scan of her abdomen showed constipation without an obstruction. Fluid was aspirated from her abdominal wall and enemas were administered for stool evacuation. The claimant reported improvement in her abdominal pain and she was discharged with the feeding tube since she still could not tolerate solid foods (Exhibits 10F and 13F).

The feeding tube was removed in late January 2016 and the claimant reported to a dietician that she was doing well. She indicated that she was having normal bowel movements and was tolerating oral intake. The dietician recommended that the claimant consume 70 grams of protein daily; 64 ounces of water; and perform 45 to 60 minutes of daily aerobic exercise with strength training two or three times per week. The clinician noted that the claimant's weight was 239 pounds (Exhibit 13F).

In February 2016, the claimant told her primary care physician that she was still vomiting within ten minutes of eating and drinking. She denied constipation. She indicated that she would not see the surgeon who performed her bypass surgery again until May, and he had not prescribed her pain medication because of the side effects of constipation. The claimant's primary care physician noted that the claimant reported that she was in terrible pain, but she spoke in full sentences and appeared to be sitting comfortably during the examination. The physician observed that the incision was healing well and there was tenderness to palpation near the umbilicus. The physician also noted decreased bowel sounds. The claimant weighed 233 pounds with a BMI calculated at 42.73. The clinician prescribed Amitiza to help with stooling and abdominal pain. She also noted that the claimant had had irritable bowel syndrome (IBS) symptoms in the past with constipation and pain, so this was a reasonable alternative to narcotic pain relief (Exhibit 7F).

A month later, in March 2016, the claimant told her primary care physician that she was vomiting multiple times in a day. She indicated that Tramadol was not helping her abdominal pain and her

insurance carrier did not approve the previously prescribed Amitiza. The physician noted that the claimant weighed 231 pounds and that she had not lost a significant amount of weight since the last visit in February. The clinician also noted that her laboratory tests were normal and she did not appear dehydrated or in poor health. The physician indicated that narcotic pain medication would only likely make the pain worse as it would constipate her. Upon examination, the physician noted that the claimant appeared quite tender on the left side of her abdomen near the incision. She also observed a different tissue texture in that area from other areas of the abdomen. The physician prescribed Flagyl for ten days to treat a possible infection in the intestinal tract. The clinician prescribed Norco for breakthrough pain (Exhibit 8F).

In April 2016, the claimant reported that she still vomited after every meal. The clinician noted that she had lost weight and weighed 222 pounds, but did not appear dehydrated. The physician advised the claimant that ongoing treatment with opioids was not a solution despite her insistence that they did not constipate her. The physician indicated that she was not comfortable providing long-term pain management for abdominal pain and suggested that the claimant speak with the surgeon for a possible referral for pain management or further gastrointestinal evaluation (Exhibit 8F).

An upper gastrointestinal series conducted in May 2016 was unremarkable with no signs of any obstruction, dilatation, reflux or hernia in the stomach. The surgeon who performed the claimant's gastric bypass procedure examined her at a routine post-operative examination in July 2016 and noted that she had lost 86 pounds. He indicated that the claimant was doing well and was on track to have an excellent weight loss outcome (Exhibits 9F and 13F).

In September 2016, the claimant told her primary care physician that she was sick of being in pain and vomiting after every meal. The claimant reported that she had fecal incontinence for the previous three weeks, but not every day. She indicated that she did not think that the prescribed Compazine, Promethazine, and Zofran were effective in treating her gastrointestinal problems, and the clinician discussed weaning off of these medications if they were not helping. The clinician noted that her weight was 198 pounds with a BMI of 36.21. The physician advised the claimant to stop taking the Compazine and continue with the Promethazine. The clinician noted that they would wean her off of the Promethazine if her vomiting did not increase. The physician also advised the claimant to take Ibuprofen intermittently, but limit her amount of Tylenol. She recommended a fiber supplement to help bulk her stool and avoid incontinence. The physician indicated that if she was constipated,

she should drink more water with fiber, and she should drink less water if she had diarrhea. The physician told her that she did not have many other suggestions for her gastrointestinal condition and pain issues and that she could seek an opinion from another physician. The claimant testified that she had an appointment with a different physician the day after the hearing (Exhibit 15F).

In addition to her hernia and gastrointestinal conditions, the claimant alleges disability due to low back pain. The record shows that the claimant first reported low back pain to a treating physician in April 2014. At that time, she told her primary care physician that she injured her back while assisting her aunt to the bathroom; her aunt fell and the claimant tried to prevent her from falling. She told the clinician that she had low back pain that radiated to her buttocks. The claimant stated that she sought treatment at a hospital emergency room at the time of the incident, and was given Norco and Flexeril for pain relief The clinician observed that the claimant was wincing during the clinical examination. The physician observed tenderness along the L5 disc level and across her sacroiliac joints. The clinician noted that the claimant exhibited a limited range of motion, particularly with flexion and extension. The physician also noted positive straight leg raising bilaterally. The physician recommended rest, ice, heat, limited lifting and to continue taking Norco for one week. The clinician also prescribed Baclofen for muscle spasms (Exhibits 2F and 7F).

X-rays of lumbar spine taken in April 2014 showed moderate degenerative disc changes at the L4-5 level; and a hypoplastic disc due to a segmentation anomaly at the L5-S1 disc level. The claimant returned to her primary care physician in May 2014 and reported that she was still having low back pain that extended down her left leg. The physician observed that the claimant was acutely tender over the L5-S1 disc level and SI joint. The clinician also observed decreased sensation over the central buttock and a positive straight leg raising on the left. The physician ordered an MRI and advised continued weight loss and smoking cessation. An MRI showed a small left paracentral disc extrusion at the L4-5 disc level, which extended inferiorly and abutted the left L5 nerve. There was no foraminal stenosis at that level. The test results also showed a disc bulge at the L5-S1 disc level and degenerative changes of the facets. There were no signs of significant stenosis or nerve compression at that level. In late May 2014, the claimant reported to her primary care physician that her low back pain had decreased and her functioning had improved (Exhibits 2F, 7F).

The claimant told her primary care physician in June 2014 that she continued to have back pain. She indicated that she had run out of

Norco and Baclofen, and reported difficulty with walking. The clinician observed tenderness along the lumbar spine, and poor flexion and extension. The physician refilled her prescriptions and referred her to physical therapy treatment. There are no other reports of back pain or medical treatment for back pain in the record until September 2014, when the claimant reported back pain to her primary care physician. The claimant reported that she felt her back seize up while moving boxes, but that resting had helped relieve the pain. Upon examination, the clinician did not observe an abnormal gait, nor any motor or sensory deficits. The physician refilled the claimant's Baclofen prescription. The clinician observed some tenderness in the LS region in October 2014, after the claimant reported moving boxes the day before. The claimant requested that the clinician complete paperwork for her disability claim and the clinician declined, explaining that she would need a more in depth examination from a physiatrist (Exhibits 2F, 7F).

During a clinical examination conducted in November 2014 at a local hospital emergency room, the attending physician observed a normal range of motion of the claimant's spine with no tenderness. In September 2016, the claimant reported to her primary care physician that she thought she pulled a muscle in her back. She described pain in her mid-back level that radiated to her left knee. The claimant indicated that she was taking a large amount of Tylenol and 800 milligrams (mg) of Ibuprofen to relieve the pain. The clinician discouraged her from taking so much Tylenol because it could cause liver failure. During the examination, the physician observed tenderness along left sacroiliac joint and the left lumbar paraspinal tissue. The claimant's gait and station were normal, and sensory and motor examinations were normal. The clinician assessed the claimant with lumbar strain and advised her to taken Ibuprofen intermittently and limit her Tylenol intake. The physician noted that a pain clinic had advised the claimant that they could not provide any additional benefit to her and recommended a referral to another pain clinic for her low back and abdominal pain (Exhibits 2F, 15F).

The claimant also alleges disability due to knee pain due to osteoarthritis. There is no real record of disabling knee pain until she sought treatment in November 2014 at a local hospital emergency room after falling from the second or third step of a step ladder. She told the examining clinicians that she heard and felt a pop behind her left knee while walking upstairs after the fall. She described knee pain with weight bearing. Upon examination, the attending physician observed moderate tenderness to the left knee, but no joint effusion or swelling. X- rays of the left knee showed osteophytes at

the medial and lateral compartments, but no fracture or bony lesions. The claimant was fitted with a splint and crutches, and advised to use both for three weeks. The physician prescribed Valium, Norco, and Motrin, 600 mg and told the claimant to follow-up with her primary care physician (Exhibits 2F and 14F).

The claimant continued to report knee pain with weight bearing and ambulation to her primary care physician in December 2014. The clinician noted that the claimant had only used the crutches and brace for one week and had not seen the orthopedist as recommended. The claimant indicated that Ibuprofen was not providing pain relief. On examination, the physician observed a negative drawer and McMurray test and referred her to an orthopedist (Exhibit 2F).

An MRI of the claimant's left knee performed in February 2015 revealed a tear of the medial meniscus; mild tricompartmental osteoarthritis; and a small knee joint effusion. The claimant had surgery to repair the tear in February 2015 and physical therapy treatment after surgery. Physical therapists noted that the claimant's knee function was improving, but she missed almost three weeks of treatment in April 2015 due to illness. At a follow-up examination with the surgeon in April 2015, the claimant reported that she continued to have significant pain. She stated that her ambulation had improved, but she experienced pain when standing up from a seated position and with climbing stairs. The clinician observed improved knee tracking, but also noted crepitus in the patellofemoral compartment with range of motion. Testing revealed negative findings with the following: varus/valgus stress test; anterior/posterior drawer test; Lachman test; McMurray test; and a negative Homan's sign. The physician noted a range of motion of her knee from 0-110° without any significant pain with active and passive range of motion. The physician advised the claimant that she would likely continue to have pain symptoms because she had osteoarthritis in her left knee (Exhibit 14F)

A surgeon advised conservative treatment of the claimant's pain and symptoms because she was too young for a knee replacement. The surgeon recommended that she continue with physical therapy and aquatic therapy because she still had weakness in her knee. The clinician observed 4/5 muscle strength in the flexors/extensors, and she was unable to do a single-legged squat. The clinician told the claimant that her weakness must improve in order for appropriate improvement in her pain and symptoms. The physician also noted that the claimant weighed 273 pounds and told her weight reduction would improve her pain and symptoms. He advised her to continue with Ibuprofen 800 mg every eight hours and to ice her knee three

or four times a day to decrease pain and inflammation. The clinician also recommended a series of five Supartz injections, which were administered weekly in June 2015 (Exhibit 14F).

After her fourth injection in June 2015, the claimant reported that her pain level had decreased with certain activities and that the swelling had improved. The surgeon advised her that it might take up to four to six weeks after the injections to get adequate pain relief and recommended a follow-up examination in six weeks. There is no evidence in the record that the claimant returned to the surgeon for a follow-up (Exhibit 14F).

In September 2015, the claimant reported right knee and leg pain to her primary care physician. She described tightness in the posterior region of the knee. The claimant indicated that she was treating her pain with ice; elevation; and Ibuprofen 800 mg since she had run out of Norco. On examination, the clinician observed mild edema in the lateral part of the right knee, but no ballotment. The claimant exhibited tenderness along the joint line and posteriorly, and the clinician noted that the claimant's pain response appeared heightened with only light palpation. The clinician reported that the claimant was able to palpate with distraction without any difficulty and that a Homan's sign was negative. The physician noted that the claimant's right knee joint was enlarged like her left knee joint, and likely due to osteoarthritis, but that the claimant's pain response was out of line with the possible pathology. The clinician also noted that it might be related to the recent discontinuation of Norco. The physician advised her to stop using Ibuprofen and prescribed Indomethacin (Exhibit 7F).

At a physical consultative examination conducted on the day after the claimant's knee surgery in February 2015, examiner R. Scott Lazzara, M.D. noted that the examination was limited due to her recent surgery. The claimant was using a walker. The claimant indicated that before her surgery, she was able to drive and perform light household chores. She also reported that on good days, she did not have any problem with sitting and standing and was able to walk about 1/8 of a mile. The physician indicated that the claimant weighed 270 pounds with a height of 62." The claimant could not get on the examination table, heel and toe walk, squat, or hop due to her recent surgery. Dr. Lazzara observed normal bowel sounds during the clinical examination. He did not detect any evidence of joint laxity, crepitance, or effusion during the musculoskeletal examination. The physician noted that straight leg raising was negative and there were no signs of paravertebral muscle spasm. The claimant exhibited a reduced range of motion during extension, right lateral flexion, and left lateral flexion (10° out of 25°). Her motor

strength was 5/5, except diminished to 4/5 at her left knee. Her muscle tone was normal and sensation was intact to light touch and pinprick. Romberg's testing was negative (Exhibit 4F).

Dr. Lazzara assessed the claimant with fibromyalgia and arthropathy and noted post-operative tenderness in her left knee, as well as tenderness in the lumbar spine and rhomboid area. The physician noted a 100-pound weight gain over the previous year due to deconditioning. He advised weight reduction and increased activity as tolerated (Exhibit 4F).

Dr. Lazzara examined the claimant again in March 2015 for a subsequent physical consultative examination, and noted that she was four weeks post-operative knee surgery. She was not using an assistive device, but walked with a moderate left limp. The claimant reported that she was now able to drive and could perform her activities of daily living slowly, though she had difficulty walking up stairs. She indicated that she could sit and stand for 20 minutes due to her knee pain. The claimant had more mobility since the last examination. She was able to perform heel to toe walking and stand on her left leg with moderate difficulty. The claimant was also able to perform a partial squat and stand on her right leg with mild difficulty. The claimant also improved in that she exhibited a normal range of motion in all directions of the lumbar spine. Dr. Lazzara assessed the claimant with fibromyalgia and noted that she continued to have active pain, mostly in the left knee. The physician indicated that he did not find any other significant trigger points, but noted she was mildly deconditioned. Dr. Lazzara also noted a history of abdominal hernias, but did not detect any tenderness in the abdominal area or evidence of obstructive disease (Exhibit 5F).

The claimant has also been treated at a sleep clinic for sleep apnea during the relevant period. According to the record, a sleep study conducted in February 2013 revealed moderate obstructive sleep apnea and the claimant was fitted with a continuous positive airway pressure (CPAP) machine. The claimant reported that she felt better after using the CPAP device, with an improvement in her energy levels and sleepiness. At a sleep study performed in July 2015, the claimant reported that she used the CPAP device every night. The claimant reported that symptoms of daytime fatigue had increased over the previous six months. A sleep study was conducted to test the effectiveness of her CPAP machine and an adjustment was made on the level of pressure, with good results. The clinician noted that her oxygen saturation level had stabilized and stayed above 95% with the increased titration to 17 centimeters (cm) of pressure. The clinician did not detect any significant cardiac arrhythmias during the testing (Exhibit 12F).

The claimant is obese with a weight that has fluctuated during the relevant period from a high of 272 pounds to 198 pounds, as documented in treatment notes from September 2016. At a height of 5' l" and a weight of 272, the claimant's body mass index value (BMI) was 51.39. That BMI places the claimant in the Level III (extreme) obesity category, according to the guidelines issued by the National Institutes of Health (NIH) and contained in SSR 02-lp. The claimant's BMI is 37.41 at a weight of 198 pounds. That BMI places the claimant in the Level II obesity category, according to the guidelines issued by the NIH. As required under that ruling, the cumulative effects of the claimant's obesity have been fully considered in the same manner as all other medically determinable impairments in arriving at the residual functional capacity (RFC) limitations adopted in this decision.

(PageID.53-59).

## II.      Listing of Impairments

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled.   Plaintiff argues that she is entitled to relief because the ALJ's determination that she does not satisfy Sections 1.02 or 1.04 of the Listings is not supported by substantial evidence.   Plaintiff bears the burden of establishing that she satisfies the requirements of a listed impairment.  *See*, *e.g.*, *Bingaman v. Commissioner of Social Security*, 186 Fed. Appx. 642, 645 (6th Cir., June 29, 2006).

A.      Section 1.02

Section 1.02 of the Listing applies to:

Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity. . .and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).   With:

A.      Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in

15

> inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R., Part 404, Subpart P, Appendix 1 § 1.02A.[2]

> Section 1.00(B)(2)(b) provides, in relevant part, as follows:

> (1) Definition.   Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.   Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.   (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.   They must have the ability to travel without companion assistance to and from a place of employment or school.   Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.   The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.00.

> The ALJ expressly examined whether Plaintiff satisfied this Listing, concluding that "the record fails to demonstrate a gross anatomical deformity of the knees and chronic joint pain and stiffness with a limitation of motion and a medical finding of narrowing, bony destruction,

---

[2] Section 1.02A of the Listings addresses weight-bearing joints and the ability to ambulate effectively whereas Section 1.02B addresses upper extremity impairments and the ability to effectively perform fine and gross movements.   While Plaintiff has failed to specifically indicate whether she believes she is disabled pursuant to Section 1.02A or Section 1.02B, her argument is limited to discussion of her back/lower extremities and her ability to ambulate.   Accordingly, the Court has interpreted Plaintiff's pleading as asserting the argument that she is disabled pursuant to Section 1.02A.

or ankylosis of the knee." (PageID.51). The ALJ further concluded that "the record evidence fails to establish an inability to ambulate effectively." (PageID.51). These conclusions are supported by the evidence as detailed above.

In her brief, Plaintiff does not cite to any evidence in support of her claim that she satisfies this Listing. Instead, Plaintiff merely states in conclusory fashion that "these listings appear to be met in this case." (ECF No. 11 at PageID.1225). Plaintiff's apparent invitation for the Court to re-weigh the evidence that was before the ALJ is an insufficient basis for relief. In her reply brief, Plaintiff cites to various portions of the record indicating that Plaintiff was observed to exhibit an antalgic gait. (ECF No. 13 at PageID.1254-55). However, exhibiting an antalgic gait does not equate with a failure to ambulate effectively which is required for this Listing. *See, e.g., Brown v. Berryhill*, 2018 WL 3548843 at *19 (N.D. Ohio, July 24, 2018) (exhibiting an antalgic gait is insufficient to establish ineffective ambulation); *Ritz v. Colvin*, 2016 WL 1458914 at *14 (M.D. Pa., Mar. 9, 2016) (same); *Sturick v. Astrue*, 2012 WL 4866457 at *3 (N.D.N.Y., Oct. 12, 2012) (same). The ALJ's conclusion that Plaintiff failed to carry her burden that she satisfied all the requirements of this Listing is supported by substantial evidence. Accordingly, this argument is rejected.

B.     Section 1.04

Section 1.04 provides as follows:

*Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root. . .or the spinal cord. With:

A.     Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss

17

and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine), or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.04.

In support of his conclusion that Plaintiff did not satisfy this Listing, the ALJ stated that "diagnostic testing did not establish evidence of spinal arachnoiditis or lumbar spinal stenosis." (PageID.51). The ALJ further observed that "there is no evidence of nerve root or spinal cord compression" and "clinical findings of [Plaintiff's] strength, sensation, and reflexes were normal." (PageID.51). These conclusions are supported by substantial evidence as detailed above.

In support of her position that she satisfies the requirements of this Listing, Plaintiff cites to two items in the record: (1) treatment notes dated June 3, 2014, indicating that Plaintiff was experiencing a herniated lumbar disc; and (2) the results of an April 30, 2014 MRI examination which revealed that while Plaintiff was experiencing degenerative changes in her lumbar spine, she was not experiencing compression of a nerve root. (PageID.382-83, 407). This evidence fails to establish that Plaintiff satisfies the requirements of this Listing. The ALJ's conclusion that Plaintiff failed to carry her burden that she satisfied all the requirements of this Listing is supported by substantial evidence. Accordingly, this argument is rejected.

## III.    Assessment of Fibromyalgia

While Plaintiff alleges that she is disabled due, in part, to fibromyalgia, the ALJ found that Plaintiff had failed to establish that her fibromyalgia constituted a severe impairment. (PageID.48-49).    Plaintiff argues that this error entitles her to relief.

In support of his conclusion that Plaintiff's fibromyalgia does not constitute a severe impairment, the ALJ expressly relied upon the guidance provided in Social Security Ruling 12-2p, Titles II and XVI: Evaluation of Fibromyalgia, 2012 WL 3104869 at *1 (S.S.A. July 25, 2012).    Specifically, the ALJ stated:

> The claimant testified that she was diagnosed with fibromyalgia seven years ago. She stated that she has not been prescribed medication except for narcotic pain medication to treat her pain symptoms. SSR 12-2p contains guidance on determining whether an individual has the medically determinable impairment of fibromyalgia: 1) a licensed physician must provide a diagnosis of fibromyalgia; 2) this licensed physician must have actually reviewed the claimant's medical history; and 3) this physician must also have conducted a physical examination on the claimant. The ruling also includes two separate criteria that may be used to establish fibromyalgia as a medically determinable impairment. The first criteria is based on the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia and the second set of criteria is based on the updated 2010 American College of Rheumatology preliminary diagnostic criteria. The 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia requires: a history of widespread pain present for at least three months and a positive finding of palpation in at least 11 of 18 tender point sites. Pain is considered widespread when all of the following are present: pain in the left side of the body, pain in the right side of the body, pain above the waist, pain below the waist, and axial skeletal pain. There must also be evidence that other disorders that could cause the symptoms or signs were excluded.
>
> There is no evidence in the file to substantiate a diagnosis of fibromyalgia based on these criteria, and the ruling states that symptoms alone do not establish the impairment. R. Scott Lazzara, M.D., the licensed physician who conducted the physical consultative examination diagnosed the claimant with fibromyalgia, which satisfies the first requirement of the ruling. But it is not

19

apparent from the record if he reviewed the claimant's medical history or if he merely relied on the claimant's reports of her medical history. While Dr. Lazzara did perform a physical examination of the claimant, there is no evidence in the consultative examination report that he performed an evaluation using the American College of Rheumatology criteria listed above. Despite the claimant's testimony that she was diagnosed with this condition seven years ago, the record does not contain evidence of this diagnosis from the treating clinician with evidence of the clinical findings as required under the ruling. I find that this is a non-severe impairment (Exhibits 4F, 5F).

(PageID.48-49).

The ALJ's analysis of this impairment is entirely consistent with Social Security Ruling 12-2p and supported by substantial evidence. Plaintiff has failed to identify any evidence to the contrary, but instead merely invites the Court to re-weigh the evidence presented to the ALJ. Accordingly, this argument is rejected.

## IV.        Assessment of Obesity

Plaintiff argues that the ALJ failed to properly consider her obesity when assessing her RFC. Specifically, Plaintiff asserts that the ALJ failed to comply with Social Security Ruling 02-1p, Titles II and XVI: Evaluation of Obesity, 2000 WL 628049 (S.S.R., Sept. 12, 2002).

As the Sixth Circuit has held, Social Security Ruling 02-1p "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Commissioner of Social Security*, 359 Fed. Appx. 574, 577 (6th Cir., Dec. 22, 2009); *see also*, *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir., Jan. 31, 2006) ("[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants").

The ALJ recognized that Plaintiff is obese and assessed in detail the entire record in determining Plaintiff's RFC. As noted above, the ALJ imposed on Plaintiff a very limited RFC which is supported by substantial evidence. The evidence does not support the argument that Plaintiff's obesity, either alone or in combination with her other impairments, impairs her to an extent greater than that recognized by the ALJ. This argument is, therefore, rejected.

## V.    Assessment of the Medical Opinion Evidence

On January 31, 2015, Plaintiff participated in a one-time consultive examination conducted by Carol Lehmann, MA, LLP. (PageID.410-15). As part of her assessment, Lehmann observed that "pain interferes with [Plaintiff's] concentration, motivation, and performance." (PageID.415). Plaintiff argues that this statement, in conjunction with the vocational expert's testimony that being off-task more than 15 percent of the workday precluded all employment, (PageID.97), demonstrates that the ALJ erred by not finding her disabled. Lehmann did not find or even suggest that Plaintiff would be off-task more than 15 percent of the workday. Moreover, there is nothing in the record supporting such a limitation. Accordingly, this argument is rejected.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Dated: December 20, 2018                                    /s/ Ellen S. Carmody
                                                          ELLEN S. CARMODY
                                                          United States Magistrate Judge